IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | NO. 9:14-CR-13(1) |
| | § | |
| HENRY KORVETT BAMS | § | |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE
JUDGE ON THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Pending is a motion to suppress evidence (Doc. No. 61) filed by the Defendant, Henry Korvett Bams.[1] Bams' original suppression motion failed to specify the particular evidence he sought to suppress and the grounds for its suppression. As such, the undersigned entered an order requesting Bams to file a brief in support of his motion. In his subsequent briefing (Doc. No. 67), Bams limited the scope of his request to the traffic stops on July 6, 2014 in Nacogdoches, Texas, and July 22, 2014 in Hot Springs County, Arkansas. The United States filed two briefs in response to the Defendant's motion (Doc. Nos. 66 and 69), and the undersigned magistrate judge heard testimony and oral argument on March 10, 2015. The undersigned finds that both traffic stops and subsequent detentions were lawful, and accordingly, recommends denying Bams' motion to suppress.

**I. Nacogdoches County Traffic Stop**

On July 6, 2014, Texas Department of Public Safety Trooper Hulon Baggett witnessed a speeding vehicle on Highway 259 in Nacogdoches County, Texas and initiated a traffic stop. Bams

---

[1] This motion is referred to the undersigned United States magistrate judge for review, hearing if necessary, and submission of a report with recommended findings of fact and conclusions of law. United States v. Raddatz, 447 U.S. 667, 681-84 (1980); see also 28 U.S.C. § 636(b)(1)(B) and Local Rules for the Assignment of Duties to United States Magistrate Judge.

was driving the vehicle and Frederick Mitchell, Bams' co-defendant in this case, was the passenger. As he approached the vehicle, Trooper Baggett smelled a marijuana odor emitting from the vehicle and noticed that Bams' eyes were bloodshot. Consequently, Trooper Baggett asked Bams to step outside the vehicle where he asked him about the details of his trip. Bams responded that he was using a rental vehicle to drive from Wisconsin to Houston where he would stay for three days to see a late graduation for a relative. Bams said he intended to stay in a hotel near the Houston Galleria. Trooper Baggett reviewed the vehicle rental agreement and noticed that the car was rented on July 5, 2014, and was expected to be returned on July 7, 2014 – several days before Bams intended to return to Wisconsin. Trooper Baggett also questioned Bams about the odor of marijuana, but Bams denied smoking marijuana in the vehicle.

Trooper Baggett also questioned Mitchell, who admitted that he and Bams had previously been smoking marijuana, and presented a "Swisher Sweet" pouch containing a hand-rolled cigar of marijuana. Mitchell reported that they were traveling to Houston and would be staying not in a hotel, but with family. Trooper Baggett also asked Mitchell if they were transporting any large sums of currency in the vehicle, which he denied. Trooper Baggett asked Mitchell if they had any luggage in the vehicle, and Mitchell responded that he had a blue duffel bag and that Bams had an orange Nike bag in the trunk.

After Mitchell showed him the marijuana cigar, Trooper Baggett witnessed Mitchell place something in a trash bag at his feet. At that point, Trooper Baggett initiated a probable cause search of the vehicle, which resulted in the discovery of a second marijuana cigar in the trash bag and approximately $253,341 in United States currency within the blue duffel bag and plastic Nike bag in the trunk of the vehicle. They were both subsequently arrested for the state offense of money

2

laundering. See Tex. Pen. Code § 34.02; (Doc. No. 66, p. 3.)

For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. See United States v. Breeland, 53 F.3d 100, 102 (5th Cir. 1995). Even a minor violation can justify a traffic stop. See, e.g. United States v. Zamora, 661 F.3d 200, 204 (5th Cir. 2011) (holding that a missing front license plate and cancelled rear license plate provides police with reasonable suspicion); United States v. Summers, 108 F. App'x 192, 193 (5th Cir. 2004) (holding that the district court did not err in holding a traffic stop was justified by believing the testimony of the arresting officer who stopped the vehicle because of the driver's failure to signal before turning). Traffic stops, whether supported by probable cause or a reasonable suspicion, are treated as *Terry* stops. A *Terry* stop refers to the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), which holds that courts must apply a two-step reasonable suspicion inquiry to:

1) determine whether the officer's action was justified at its inception, and

2) determine whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place.

Zamora, 661 F.3d at 204. The government bears the burden of establishing the two elements under *Terry* by a preponderance of the evidence. United States v. McMahan, No. 3:07-CR-152, 2007 WL 2470999, at *4 (N. D. Tex. Aug. 30, 2007) (citing United States v. Sanchez-Pena, 336 F.3d 431, 437 (5th Cir. 2003)).

Bams does not challenge the validity of the initial traffic stop for speeding in Nacogdoches County. Instead, he admits that the stop was legal, but argues that Trooper Baggett violated the

second prong of the *Terry* analysis by exceeding the scope of the stop and excessively and unconstitutionally prolonging his detention.

Under the second prong of the *Terry* test, the relevant question is whether Trooper Baggett's actions, after he legitimately stopped Bams' vehicle, were *reasonably related* to the circumstances that justified the stop. United States v. Brigham, 382 F.3d 500, 507 (5th Cir. 2004). Generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. . . ." Id. In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on the occupants to investigate whether the driver has any outstanding warrants or if the vehicle is stolen. Id. at 507–08. An officer may also ask the driver about the purpose and itinerary of his trip. Id. at 508.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no longer reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention. Id. at 510; see also United States v. Jones, 234 F.3d 234, 241(5th Cir. 2000). A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed. See Brigham, 382 F.3d at 507; United States v. Grant, 349 F.3d 192, 196 (5th Cir. 2003).

There were several factors to justify Trooper Baggett's continued roadside detention of the Defendant. Initially, Trooper Baggett noticed an odor of marijuana and observed Bams exhibit signs

of nervousness.[2] Bams and his passenger gave conflicting travel plans (staying with family versus staying in a hotel), and the vehicle rental agreement did not reflect Bams' alleged itinerary. Also, Mitchell admitted to smoking marijuana and surrendered a marijuana cigar. These factors constitute ample grounds for Trooper Baggett's reasonable suspicion that Bams was involved in criminal activity and justified their continued detention. Bams also gave consent to search the vehicle. Accordingly, the undersigned finds that Bams' roadside detention was lawful, reasonably related to the circumstances that justified the stop, and properly continued until the new reasonable suspicion of criminal activity that arose right after the stop was confirmed. See Brigham, 382 F.3d at 507.

## II. Hot Springs County, Arkansas Traffic Stop

Arkansas State Trooper Adam Pinner testified that on July 22, 2014, he was driving eastbound on Interstate 30, a four-lane highway divided by a grassy median, when he witnessed a green Chrysler Sebring pass a tractor-trailer on its left and return to the right lane within fifty feet of the front of the tractor-trailer. Trooper Pinner initiated a traffic stop believing that the driver violated the Arkansas Transportation Code by not clearing a safe distance before returning to the right lane in front of the tractor-trailer.

Trooper Pinner identified Bams as the driver of the vehicle and Frederick Mitchell as the passenger. He testified that Bams' hands were shaking and he exhibited heavy breathing when he presented his driver's license and registration. Bams did not refute the reason for the traffic stop. Trooper Pinner also noticed that Bams and his passenger were drinking energy drinks, there was a

---

[2] The court notes that the smell of marijuana alone might be enough to constitute reasonable suspicion to prolong a roadside detention under *Terry*. See United States v. Nunn, No. 12–50504, 2014 WL 782957, at *1 (5th Cir. Feb. 28, 2014) (holding reasonable suspicion for detention present after officer approached defendant's car and smelled marijuana); United States v. Rhine, Nos. 4:12–CV–931–A, 4:07–CR–183–A, 2013 WL 1718108, at *4 (N.D. Tex. Apr. 18, 2013) (finding reasonable suspicion for detention after officer smelled marijuana in car defendant was a passenger in and defendant admitted "that he had smoked marijuana earlier that night").

5

single key in the ignition, and that it appeared as if someone had tampered with the rear driver-side door panel. Based on these indicators, Trooper Pinner suspected Bams could be transporting narcotics and asked him to step out of the car and stand in front of his patrol car where he proceeded to pat him down to ensure Bams was not carrying any weapons. Bams was not carrying a gun or any other weapon, but he did have a large amount of currency in his pocket. Trooper Pinner initiated the criminal background check with police dispatch and while it was pending, asked Bams about his trip. Bams told Trooper Pinner that he traveled to Dallas from Wisconsin for a party, but was mistaken as to when it was to take place – the party was not until the following week. Bams also informed Trooper Pinner that he traveled to Dallas for his niece's graduation, but again, the graduation was not until the following week. Bams also reported that he was in Dallas to visit family, but that he decided to leave early because he was staying in a 3 bedroom house with 15-20 people. Shortly into their discussion, Trooper Pinner received the report of Bams' criminal history.[3]

Trooper Pinner testified that the totality of the circumstances gave rise to a reasonable suspicion of criminal activity.[4] Based on his suspicion, he asked Bams for consent to search the car, which was granted. Trooper Pinner explained to Bams that he had the right to limit the scope of the search, or to revoke consent at any time. Trooper David Hamilton appeared at the scene to assist in the search of the vehicle. Approximately twenty-three minutes into the stop, Troopers Pinner and Hamilton found ten one-kilogram bundles of cocaine that were hidden in the rear door panels of Bams' vehicle.

---

[3] At the hearing, Trooper Pinner did not disclose the details of Bams' criminal history report.

[4] Trooper Pinner testified that Bams' nervous behavior and heavy breathing, the single key in the ignition (signifying it was a rental car which are often used by drug couriers), the large amount of cash in his pocket, his criminal history, and the energy drinks all contributed to a reasonable suspicion of criminal activity.

Bams challenges the validity of the Arkansas stop under the first prong of the *Terry* analysis and claims that there was no reasonable suspicion to initiate a traffic stop.[5] He also claims that the traffic stop was the result of racial profiling and suggests that the traffic stop was merely a pretext because Bams is African American.

Trooper Pinner testified that he stopped Bams for an unsafe lane change in front of a tractor-trailer, in violation of Arkansas Transportation Code § 27-51-306, which states:

> The following rules shall govern the overtaking and passing of vehicles proceeding in the same direction, subject to those limitations, exceptions, and special rules stated:
>
> (1) The driver of a vehicle overtaking another vehicle proceeding in the same direction shall pass to the left at a safe distance and shall not again drive to the right side of the roadway *until safely clear of the overtaken vehicle* . . .

The court must determine whether, objectively, Trooper Pinner had a reasonable suspicion that some sort of illegal activity, in this instance a violation of Arkansas traffic regulations, occurred or was about to occur, before stopping Bams' vehicle. See United States v. Coronado, 480 F. Supp. 2d 923, 927 (W.D. Tex. 2007) (citing United States v. Lopez-Moreno, 420 F.3d 420, 430 (5th Cir. 2005)).

The video of the traffic stop presented at the hearing (Gov. Ex. 1(b)) does not show the alleged unsafe pass (presumably because only the ensuing stop was recorded). However, Trooper Pinner testified that Bams' vehicle passed a tractor-trailer on the left and returned to the right lane within fifty feet of the front of the tractor-trailer, or the approximate length of one trailer. Trooper Pinner testified that at highway speeds in which Bams was traveling (65 miles per hour), a car should allow 200 feet before returning to the right lane – or the length of 3 tractor-trailers.

---

[5] Bams did not assert that Trooper Pinner exceeded the scope of the stop or prolonged his detention excessively or unconstitutionally under the second prong of *Terry*.

In its briefing, the Government cites a common law "assured clear distance ahead" rule, also known as the "two-second rule," which provides that the safe distance between two cars traveling at 65 miles per hour is at least 192 feet. (Doc. No. 66, p. 8.) The Government also argues that the type of vehicle passed affects the safe passing distance, and cited to a State of Arkansas driver's license study guide that reports that a fully loaded tractor-trailer traveling at 55 miles per hour may take more than 400 feet to come to a complete stop. (Id., p. 9.) The Defendant did not argue or show evidence to demonstrate that a distance of fifty feet between a vehicle and tractor-trailer constitutes a safe distance. Rather, in his briefing, he argues that the Arkansas Transportation Code does not provide for a specific distance (e.g., 200 feet, as Trooper Pinner indicated to Bams during the traffic stop) before returning to the right lane after passing a vehicle, or tractor-trailer, on the left.

Section 27-51-306 of the Arkansas Transportation Code does not define or give criteria of what it means to "safely clear" an overtaken vehicle. The parties have not offered any case law interpreting the "safely clear" standard nor can the undersigned find any. However, Arkansas Transportation Code § 27-51-305 ("Following too closely") may provide some guidance to the "safely clear" standard. That statute provides in relevant part that: "(a) the driver of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of the vehicles and the traffic upon and the condition of the highway; (b)(1) the driver of any motor truck or any motor vehicle *drawing another vehicle* when traveling upon a roadway outside of a business or residence district *shall not follow within two hundred feet of another motor vehicle*." Ark. Transp. Code § 27-51-305 (emphasis added).

Trooper Pinner testified that Bams' vehicle passed the tractor-trailer and returned to the

right lane within approximately fifty feet of the front of the tractor-trailer, thereby creating an unsafe distance between the two vehicles given the weight and speed of the tractor-trailer. When Bams' vehicle pulled in front of the tractor-trailer within fifty feet, the tractor-trailer – through no fault of its own – was then "following too closely" according to section 27-51-305 of the Arkansas Transportation Code. Thus, it stands to reason, and confirms Trooper Pinner's specific articulable facts, that Bams did not "safely clear" the tractor-trailer before overtaking it in the right lane.

Based on Trooper Pinner's testimony and the Government's evidence, the undersigned finds that Bams did not allow a safe distance between his vehicle and the tractor-trailer. Accordingly, Trooper Pinner had a reasonable suspicion or probable cause to believe that Bams violated Arkansas Transportation Code § 27-51-306 by failing to safely clear an overtaken vehicle; in this case, a tractor-trailer traveling at sixty-five miles per hour. Trooper Pinner's observations allowed him to form an objectively reasonable suspicion that a traffic violation occurred, and therefore, satisfied the first prong of the *Terry* analysis. See <u>United States v. Causey</u>, 834 F.2d 1179, 1184 (5th Cir. 1987) (en banc) (holding that a stop based on a violation of law, even a minor one, is valid).

Bams' argument that the stop was unconstitutional because he was subjected to racial profiling is also unavailing. First, Trooper Pinner testified that he stopped the vehicle because of a suspected traffic violation, not because Bams is African American. There is no evidence in the record contradicting his testimony. Second, the subjective motivations of police are deemed irrelevant as long as their conduct does not exceed what they are objectively authorized to do. <u>United States v. Gillyard</u>, 261 F.3d 506, 509 (5th Cir. 2001) (citing <u>Whren v. United States</u>, 517 U.S. 806, 814 (1991)).

9

At the conclusion of the hearing, Bams raised the issue – for the first time – that certain, unidentified statements Bams made should be suppressed because *Miranda* warnings were not given. First, officers from both vehicle stops stated they gave Bams his *Miranda* warnings. Bams does not offer any evidence those warnings were not given or that they were somehow insufficient. Second, Bams could not identify any statements pre-*Miranda* that should be suppressed. Although not expressly stated, perhaps Bams argues that the officers' questioning at the side of the road constitutes a "custodial interrogation" that necessitated *Miranda* warnings. However, it is a well settled rule that questioning conducted at the roadside before a suspect is placed in handcuffs – as was the case here – is not "custodial interrogation" that requires *Miranda* warnings. See United States v. Ortiz, No. 13-20564, 2015 WL 1259953, at *7 (5th Cir. Mar. 18, 2015) ("Custodial interrogation is questioning initiated by law enforcement officers after a person has been taken into custody. A suspect is 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest."); see also Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (holding that persons subject to traffic stops who are detained by nonthreatening police questioning (including questions relating to identity) are not ordinarily "in custody" for the purposes of *Miranda*). Bams has not identified any statements that were made as a result of custodial interrogation before *Miranda* warnings were given. As such, his oral motion to suppress on this ground should be denied.

## IV.  Recommendation

Both the Arkansas and the Nacogdoches County, Texas stops satisfied the constitutional parameters for traffic stops established by the Supreme Court in Terry v. Ohio, 392 U.S. 1.

Accordingly, Bams' motion to suppress should be denied.

## V. Objections

Pursuant to 28 U.S.C. § 636(b)(1)(c) (Supp. IV 2011), each party to this action has the right to file objections to this report and recommendation. Objections to this report must (1) be in writing, (2) specifically identify those findings or recommendations to which the party objects, (3) be served and filed within fourteen (14) days after being served with a copy of this report, and (4) no more than eight (8) pages in length. See 28 U.S.C. § 636(b)(1)(c); FED R. CIV. P. 72(b)(2); Local Rule CV-72(c). A party who objects to this report is entitled to a *de novo* determination by the United States District Judge of those proposed findings and recommendations to which a specific objection is timely made. See 28 U.S.C. § 636(b)(1)(c); FED R. CIV. P. 72(b)(3).

A party's failure to file specific, written objections to the proposed findings of fact and conclusions of law contained in this report, within fourteen (14) days of being served with a copy of this report, bars that party from: (1) entitlement to de novo review by the United States District Judge of the findings of fact and conclusions of law, (see Rodriguez v. Bowen, 857 F.2d 275, 276–77 (5th Cir. 1988)), and (2) appellate review, except on grounds of plain error, of any such findings of fact and conclusions of law accepted by the United States District Judge. See Douglass v. United Servs. Auto. Ass'n, 79 F.3d 1415, 1428–29 (5th Cir. 1996).

SIGNED this 6th day of April, 2015.

_____
Zack Hawthorn
United States Magistrate Judge